[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-15737

_____

D.C. Docket No. 1:08-cv-02095-WCO


VERONZA L. BOWERS, JR.,

Petitioner-Appellant,

versus

UNITED STATES PAROLE COMMISSION,
WARDEN,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(May 22, 2019)

Before JORDAN and JULIE CARNES, Circuit Judges, and SCHLESINGER,[*] District Judge.

JULIE CARNES, Circuit Judge:

Petitioner Veronza Bowers was convicted in 1974 for the murder of a federal park ranger, and he has been incarcerated ever since. Petitioner argues that he is entitled to parole, given how much time he has served on his sentence. Petitioner's right to any parole is governed by the 1976 Parole Commission and Reorganization Act, 18 U.S.C. §§ 4201 *et seq*. (the "Parole Act" or the "Act"), under which he became eligible to be considered for "mandatory"[1] parole in April 2004. *See* 18 U.S.C. § 4206(d). Since that time, the United States Parole Commission has repeatedly denied Petitioner's requests for release under § 4206(d), finding that he is ineligible for this type of parole because he seriously violated institutional rules.

This appeal arises from his petition for a writ of habeas corpus in the Northern District of Georgia. In the district court, Petitioner alleged that the

---

[*] The Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

[1] Although the applicable provision is often referred to as the "mandatory parole" provision, in fact the provision is not mandatory, and the Commission can deny parole under this provision under one of three circumstances: if the prisoner has (1) seriously or (2) frequently violated institution rules or (3) if there is a reasonable probability that the prisoner will commit another crime in the future.

2

Commission erred in denying his parole for two reasons:  first, by applying an erroneous interpretation of the Parole Act's mandatory parole provision, § 4206(d), and second, by denying his parole in response to improper political pressure, thus failing to act as a neutral, unbiased decision-maker in considering his right to parole.  The district court denied his petition for habeas relief.  Petitioner now appeals.  After careful consideration, and with the benefit of oral argument, we **AFFIRM**.

## I.    BACKGROUND

The Sentencing Reform Act of 1984 required federal defendants to be sentenced pursuant to federal Sentencing Guidelines and it eliminated any early release from a sentence pursuant to parole.  *See* Pub. L. 98–473, §§ 218(a)(5), 235, 98 Stat. 1837, 2027, 2031 (1984); *Walden v. U.S. Parole Comm'n*, 114 F.3d 1136, 1138 (11th Cir. 1997).  Prior to enactment of the Sentencing Reform Act, the 1976 Parole Act defined the circumstances under which individuals serving prison sentences may become eligible for parole.  Notwithstanding its repeal, the Parole Act continues to apply to prisoners who were sentenced prior to the effective date of the Federal Sentencing Guidelines.  *See Walden*, 114 F.3d at 1138.

The United States Parole Commission (the "Commission") is the executive agency responsible for administering the Act's parole guidelines for the ever

3

decreasing number of inmates who are able to avail themselves of its benefits. The Commission makes discretionary judgments regarding federal prisoners' right to parole at various stages of incarceration.  In performing this function, the Commission is "independent for policy-making purposes, but is attached to the Department of Justice for administrative convenience."  S. Rep. 94-369, at 14 (1976), *reprinted in* 1976 U.S.C.C.A.N. 335, 336.

Ever since the repeal of the Parole Act, Congress has debated whether to keep the Parole Commission in existence in its current form or to disband it altogether in favor of a new administrative process for those prisoners who were not sentenced pursuant to the Sentencing Reform Act of 1984.  The Commission was initially slated for elimination under the latter statute, until Congress changed course and renewed the Commission's mandate.  Congress has reauthorized the Commission several times since then, and the Commission's continued existence depends, in part, on periodic reports from the Attorney General as to whether "the continuation of the Commission is the most cost-effective and cost-efficient manner for carrying out the Commission's functions."  Parole Commission Phaseout Act of 1996, Pub. L. No. 104-232, 110 Stat. 3055, 3056 (1996).  Thus, the Commission itself is not involved in its own reauthorization process.  Instead, it is the Attorney General who decides whether to advocate for its periodic reauthorization by Congress.

4

In the present case, Petitioner challenges the Commission's most recent denial of his claimed right to release. This present claim, however, is preceded by a lengthy and complex history involving both the Parole Commission and federal courts. Indeed, we have twice before considered his case in *Bowers v. Keller*, 651 F.3d 1277 (11th Cir. 2011) ("*Bowers I*"), and *Bowers v. United States Parole Comm'n, Warden*, 760 F.3d 1177 (11th Cir. 2014) ("*Bowers II*"). We begin by summarizing the various phases of the underlying proceedings in order to provide context for the two core issues before us on appeal.

## A.    Petitioner's Incarceration

Petitioner was tried and convicted for the brutal murder of a federal park ranger in Point Reyes National Seashore, a national park in California. He was sentenced to life imprisonment in 1974. *Bowers I* at 1282–83.[2]

---

[2] The details of the murder are as follows:

> Bowers and two other men had been stopped by [Ranger Patrick] while on an expedition to poach deer . . . . According to the Parole Commission, Bowers shot Ranger Patrick in the chest after Ranger Patrick stopped their car to investigate. Bowers jumped out of the car and shot Ranger Patrick a second time, hitting him in the left wrist. Ranger Patrick then staggered down the road and fell into the bushes. The driver brought the car alongside the dying ranger; Bowers attempted to shoot him a third time, in the chest, but his gun misfired. Bowers then attempted a fourth shot but missed. As the car left the scene of the shooting, Bowers asked one of the other men if he had seen the ranger twitch when Bowers shot him as he was lying on the ground. Several days later, Bowers told another friend who suspected him of the killing that "Yes, I had to get me one" and that the ranger had "kicked like a chicken when [Bowers] shot him."

Basing its denial of parole on Petitioner's serious violation of institutional rules, the Commission cited an unsuccessful attempt by Petitioner to escape from prison shortly after his conviction. *Id.* Specifically, in 1979, Petitioner and a fellow inmate scaled an interior perimeter fence while other prisoners were in the recreation yard. *Id.* As soon as guards detected them, Petitioner and his partner were pinned down by tower gunfire between the inner and outer fences of the recreation yard. *Id.* Gunfire twice hit the other inmate involved in the attempted escape. *Id.* In the view of prison administrators, Petitioner's actions created a "very serious situation" because it created a risk of injury to other inmates in the area. *Id.* The prison investigated the incident, and Petitioner was ultimately convicted of attempted escape. *Id.*[3]

In recent years, Petitioner has violated no prison regulations. A hearing examiner considering Petitioner's record in 2004 stated that Petitioner had not been

_____

*Bowers I* at 1283 (alterations in original) (citations omitted) (quotation marks omitted). Petitioner's conviction was upheld by the Ninth Circuit in 1976. *Id.*

[3] Petitioner was involved in a second incident that the Commission considered to a lesser degree in denying his parole. This incident involved a letter Petitioner sent to the widow of the murdered park ranger in 1990. *Bowers I* at 1284. Earlier that year, Petitioner had received a certified return receipt that appeared to show that a letter had been sent from the prison to the widow in Petitioner's name. *Id.* Investigators found that the return receipt related to a victim notification letter that the Bureau of Prisons had sent to the widow. *Id.* The return receipt had erroneously been placed in Petitioner's mail. *Id.* Confused by this communication, Petitioner responded with a letter to the widow attempting to explain the circumstances. *Id.* A parole examiner investigating the situation found that the letter was neither threatening nor intimidating. *Id.*

6

the subject of a disciplinary report since 1988 and had no history of causing

management problems for prison staff.  And according to his habeas petition,

Petitioner has used his time in prison to attain an Associate's Degree and become

an expert in meditation, yoga, the Japanese shakuhachi flute, sign language, and

baking.  A chaplain at the prison further described Petitioner as an instrumental

part of the prison's religious service programs and as having "the most positive

attitude that could be imagined."

Petitioner became eligible to be considered for mandatory parole under

18 U.S.C. § 4206(d) on April 7, 2004.  *Id*. at 1284.  This provision essentially

requires that every prisoner, no matter his crime or sentence, be released after

serving thirty years, subject to three exceptions.  The entire provision reads as

follows:

> Any prisoner, serving a sentence of five years or longer, who is not earlier released under this section or any other applicable provision of law, shall be released on parole after having served two-thirds of each consecutive term or terms, or after serving thirty years of each consecutive term or terms of more than forty-five years including any life term, whichever is earlier: *Provided, however,* That the Commission shall not release such prisoner if it determines that he has seriously or frequently violated institution rules and regulations or that there is a reasonable probability that he will commit any Federal, State, or local crime.

18 U.S.C. § 4206(d) (emphasis added).  After initially deciding to grant Petitioner

mandatory parole, the Commission subsequently changed its mind, and its actions

are at the center of this appeal.  As such, we summarize the procedural history of

7

Petitioner's pursuit of parole before the Commission, the district court, and this Court.

### B.      2005 Parole Proceedings

When Petitioner first became eligible for mandatory parole on April 7, 2004, the prison automatically processed him for release. *Bowers I* at 1284. His release was halted, however, after prison authorities informed him that he was ineligible for parole because he had waived his right to a statutory interim hearing two years earlier. *Id.*

Petitioner immediately filed an emergency habeas petition in the Middle District of Florida. *Id.* The court considered and rejected the Commission's waiver argument and faulted the Commission for failing to properly review Petitioner for mandatory parole eligibility. *Id.* The Commission was ordered to immediately consider Petitioner's rights under § 4206(d) and to hold any necessary hearings within sixty days. *Id.* In compliance with this directive, the Commission initiated a series of proceedings to determine whether Petitioner satisfied the criteria for mandatory parole.

　　　　1.      The Commission grants parole, revokes parole, reopens Petitioner's case to consider new information, and grants parole following a tie vote.

Following the above-described remand by the district court, three Commission examiners recommended that Petitioner be paroled based on his

record of good behavior during his confinement. The Commission thereafter approved Petitioner's parole under § 4206(d), on January 13, 2005. *Bowers I* at 1284. On February 17, 2005, shortly before Petitioner was set to be released, the Commission decided to reopen his case "to consider new adverse information." *Id.* at 1284–85. The information prompting reconsideration came from the victim's widow, who had submitted to the Commission a letter describing a 2002 radio interview Petitioner conducted while in prison. *Id.* at 1285. In the interview, Petitioner maintained his innocence and stated his belief that the FBI had targeted him because of his activity as a member of the Black Panthers. *Id.* Petitioner also identified himself in the interview with other prisoners who had labeled themselves "political prisoners."[4] *Id.*

The Commission re-voted Petitioner's case for parole, taking the radio interview into account as possible evidence that Petitioner was likely to commit a crime in the future. *Id.* at 1285–86. As noted, under § 4206(d), if the Commission determines that a prisoner is likely to commit a crime after release, then it must deny parole. At the time, the Commission comprised five members. *Id.* at 1282. One of them, Commissioner Fulwood, had recused himself from Petitioner's case

---

[4] For the entirety of his incarceration, Petitioner has denied any guilt for the murder of the park ranger, claiming that he was targeted for prosecution because of his association with the Black Panthers. *Id.* at 1283. He has also repeatedly referred to himself as a "political prisoner." *Id.*

9

because of his prior service as a law enforcement officer. *Id*. at 1286. The remaining four Commissioners split evenly as to whether Petitioner was eligible for parole under § 4206(d), with two Commissioners finding that he had seriously violated institution rules and was likely to commit another crime, and two Commissioners disagreeing with that finding. *Id*.

This tie vote was unprecedented in such proceedings. The Commission's General Counsel advised that, under § 4602(d), parole is mandatory unless the Commission makes an affirmative finding that one of the circumstances warranting denial has been met. *Id*. Because the tied vote produced no affirmative finding on any of the grounds on which mandatory parole may be denied—that is, a serious or frequent rule violation or a reasonable probability of committing future crime—the Commission granted Petitioner mandatory parole on May 17, 2005 (the "May 17 Grant"). *Id*.

2.    The Attorney General intervenes, and the Commission revokes parole and reopens the case for a second time.

At the end of May 2005, the Commission received a communication from the United States Deputy Attorney General requesting further information regarding Petitioner's case and asking one of the dissenting Commissioners to explain why she voted to detain Petitioner. *Bowers I* at 1286–87. The Commission replied that "[i]t would be inappropriate and not in the best interests of the Commission—or the Attorney General—for the Attorney General to ask [a

10

Commissioner] to explain her vote" because it would suggest "a relationship incompatible with the independence sought by Congress when it established the Commission and could create the appearance of an attempt to influence." *Id*. at 1287.

Unbeknownst to other members of the Commission and in disregard of the Commission's position, Commissioner Deborah Spagnoli—who had originally voted against Petitioner's parole eligibility—surreptitiously responded to the Deputy Attorney General's inquiry in a memorandum dated June 1, 2005 that outlined arguments the Attorney General could use to file an appeal of a decision to grant Bowers parole (the "Spagnoli Memo"). *See id.* at 1289. Apparently in response to the Spagnoli Memo, the Attorney General sent a follow-up letter to the Commission on June 9, 2005, which requested that the Commission "review and consider the Veronza L. Bowers matter and render a new decision on whether to grant or deny parole to Bowers." *Id*. at 1287. The Commission acceded to this request, reopened the matter, and delayed Petitioner's release pending reconsideration. *Id*.

Shortly thereafter, the Office of the Deputy Attorney General submitted another letter to the Commission advocating for the denial of Petitioner's parole on the ground that Petitioner's attempted prison escape was a "serious" rule violation

11

and should therefore preclude parole under the plain language of § 4206(d) (the "Position Letter"). *See id.* at 1288.

### 3.    The Commission unanimously denies parole.

In a final, closed meeting held on October 6, 2005, the Commission re-voted and unanimously agreed that Petitioner was not entitled to mandatory parole because his attempted prison escape constituted "serious institutional misconduct" under § 4602(d). *Bowers I* at 1288. Three of the four voting Commissioners further found that, in light of Petitioner's continued insistence that he was a political prisoner, Petitioner's initial crime was motivated by a hatred for the United States Government, and he was likely to commit another similarly motivated crime in the future. *Id.* On the basis of this vote, Petitioner's parole was denied (the "October 6 Denial"). *Id.*

## C.    2010 Habeas Proceeding

The Commission learned of the Spagnoli Memo in September 2007 and promptly notified Petitioner that the impartiality of the Commission's decision with respect to the October 6 Denial may have been compromised. *Bowers I* at 1289. By this time, Petitioner had applied for parole again and was awaiting a new hearing. *Id.* Upon learning of the Spagnoli Memo, Petitioner requested a postponement of his upcoming hearing and instead filed a habeas petition under 28 U.S.C. § 2241 in the Northern District of Georgia on June 24, 2008. *Id.* Later in

that proceeding, Petitioner requested leave to conduct discovery regarding potential bias of the Parole Commission in the event his petition was denied on its face.

In his habeas petition, Petitioner challenged as unlawful the Commission's decisions in February and June 2005 to reopen his case and vote again on his parole eligibility. *Id*. at 1289–90. He also argued that the October 6 Denial was improperly tainted by political pressure on the Commission and by the actions of Commissioner Spagnoli. *Id*. at 1290.

The district court denied the petition, concluding that, because Petitioner had not actually been released from prison at any point, the Commission did not err in twice deciding to reconsider his parole eligibility. *Id*. at 1291.

### D.    Eleventh-Circuit Review in *Bowers I*

Petitioner appealed the district court's denial of his habeas petition in May 2010. This Court reviewed that order *de novo*, focusing on the legality of the Commission's decisions to reopen Petitioner's case in both February and June of 2005. *Bowers I* at 1291. This Court first found that the February 2005 reopening, which was prompted by the Commission's receipt of new information regarding Petitioner from the victim's widow, did not violate the relevant regulations. *Id*. at 1292.

13

This Court did, however, find significant flaws in the June 2005 reopening. *Id*. at 1292–96.  We concluded that, by sending a memo to the Attorney General and advocating for his intervention in Petitioner's proceeding, Commissioner Spagnoli had "violated the Parole Act's mandate that the Parole Commission function as an independent agency, impermissibly tainting the Parole Commission's decision to reopen."  *Id*. at 1293.  On this basis, we reversed the denial of habeas relief and remanded the matter to the district court with instructions to remand the case to the Commission in its posture as of May 17, 2005—before Commissioner Spagnoli intervened in the matter.  *Id*. at 1296.  The Court further instructed the Commission to immediately review Petitioner's case on a clean slate to determine whether further action was necessary or authorized. *Id*.  The Court affirmed the district court on all other grounds.  *Id*.

## E.    2011 and 2012 Parole Proceedings

The Commission took immediate action consistent with this Court's order in *Bowers I*.  It informed Petitioner that it intended to reconsider his case and set a deadline of October 14, 2011, by which he could submit any new materials in support of his release.  On October 4, 2011, the Commission decided to re-vote the May 17 Grant.  The Commission conducted its re-vote during a closed session on December 8, 2011, and reached a unanimous decision to deny Petitioner parole

14

under § 4206(d) (the "Final Denial").[5] The Commission did not record this meeting, nor did it maintain a transcript or contemporaneous notes summarizing the Commissioners' discussion. Its decision was memorialized in a one-page letter to Petitioner dated December 15, 2011, which identified the grounds for the Commission's decision (the "Denial Letter"). In the Denial Letter, the Commission asserted that Petitioner's escape attempt "seriously violated prison rules" and "[t]he passage of time does not diminish the gravity of this rule violation."[6] The Commission withheld "for now" a finding as to whether there was a reasonable probability that Petitioner would commit another crime.

---

[5] At the time, the Commission comprised four individuals: Commissioners Mitchell, Fulwood, and Cushwa, who had previously been involved with the case, and Commissioner Smoot, who was new to the case. As before, Fulwood recused himself from the re-vote. Thus, only three Commissioners were involved in the re-vote. Both Mitchell and Cushwa had voted with respect to the October 6 Denial that Petitioner was not eligible for parole because his attempted escape constituted a "serious violation." Recall that this Court found in *Bowers I* that the October 6 Denial was invalid because it had been tainted by the improper actions of Commissioner Spagnoli. Notably, Mitchell had voted with respect to the May 17 Grant that Petitioner should be released but later changed his mind. Hence his vote against parole in subsequent proceedings.

[6] In relevant part, the Denial Letter reads as follows:

> As a result of a vote taken at the closed session of the Commission's quarterly business meeting on December 8, 2011, the Commission determined that you should be denied parole under the criteria of 18 U.S.C. § 4206(d).
>
> 1. *The Commission found that you seriously violated prison rules by your attempted escape in 1979. The violation was serious* because your attempt had the potential of causing significant unrest and disruption among the population of a secure institution. Other prisoners were in the yard at the time you and another prisoner scaled the inner fence and were trapped between the inner and perimeter fences. Your attempt drew gunfire from tower guards. Your fellow

15

In reaching this decision, the Commission had before it two memoranda written by the Commission's then-General Counsel, Rockne Chickinell, which discussed the language of § 4206(d) and made a recommendation as to Petitioner's application (the "Chickinell Memos" or the "Memos"). Both Memos expressed the opinion that Petitioner should be denied mandatory parole because his attempted escape from prison constituted a "serious" rule violation, notwithstanding his subsequent record of good behavior. Specifically, Chickinell advised that, "[g]iven the statutory terms, the Commission must deny parole to Bowers if it finds, by a majority vote, that any of the criteria listed disqualify Bowers for parole." As such, Chickinell stated that "the Commission must deny mandatory parole to Bowers if it determines that [his 1979] escape attempt seriously violated prison rules, regardless of the passage of time after the incident." The Memos proceeded to discuss the circumstances of Petitioner's attempted escape and recommend that the Commission treat that attempt as a "serious" rule

---

escapee was wounded by the gunfire. *The passage of time does not diminish the gravity of this rule violation.*

2. The Commission did not find that you have frequently violated prison rules.

3. For now, the Commission has withheld any findings on the criterion of whether there is a reasonable probability that you would commit another federal, state, or local crime if you were paroled. . . .

(emphases added).

16

violation within the meaning of § 4206(d).  As Chickinell expressly noted in each of the Memos, his recommendations were consistent with the analysis contained in the 2005 Position Letter from the Department of Justice ("DOJ"), in which the Deputy Attorney General advocated for the denial of Petitioner's parole.

As he had done at each prior stage of his parole proceedings, Petitioner pursued administrative routes to appeal the Final Denial, including a motion for reconsideration.  *See Bowers II* at 1182.  The Commission took note of this motion and voted during another closed session to affirm the Final Denial.

Petitioner argues that the timing of the Commission's decision supports an inference of bias, making the context of the Commission's Final Denial and related decision-making critical to Petitioner's position on appeal.  Specifically, in September 2011, as the Commission was reconsidering Petitioner's case on remand following *Bowers I*, a bill to extend the Commission's mandate was pending in Congress, subject to a senatorial hold.  Once the Commission determined that it would reconsider Petitioner's case, General Counsel Chickinell advised the Commission not to act on Petitioner's case until after he had an opportunity to submit supplemental information in support of his case.  Thus, he advised the Commission not to take further action until after October 14, the deadline the Commission had set for Petitioner's supplementary submissions.  The Commission disregarded this advice and authorized the re-vote nonetheless,

without waiting for input from Petitioner himself.  Two days later, the hold on the reauthorization bill was lifted and the bill to extend the life of the Commission was passed.  The Commission, however, did not actually vote on whether to deny parole until December 8, 2011.

Petitioner infers from this timeline of events that the Commission made a decision to re-vote the case prior to the Congressional vote in order to increase the likelihood of reauthorization by Congress.  Petitioner argues that because the DOJ is responsible for convincing Congress to reauthorize the Commission, and because the DOJ had repeatedly articulated its desire to preclude Petitioner's release on parole, the Commission conformed to the DOJ's preferences and agreed to release the case in order to increase the chances of a favorable outcome in Congress.  As noted, the Commission did not actually vote to deny parole until two months later, after it had been re-authorized as an agency by Congress.

### F.    2012 Habeas Proceeding

Petitioner's habeas proceeding in the Northern District of Georgia remained ongoing while the Commission reconsidered his case.  Immediately following the Final Denial, Petitioner moved the district court for leave to conduct discovery

18

regarding ongoing bias in the Commission's decision-making process.[7]  Petitioner

also moved for leave to amend his habeas petition to include allegations of

misconduct relating to the Commission's 2011–2012 parole proceedings.

The district court denied both motions, noting that this Court's mandate in

*Bowers I* did not "authorize, instruct, or suggest . . . that any additional discovery

concerning ex-Commissioner Spagnoli's activities would be necessary or prudent"

and that this Court had not granted Petitioner any relief regarding his claims that

the Parole Commission was subject to political pressure.  *Bowers II* at 1182–83

(alterations accepted).  The district court further held that the Parole Commission

---

[7]  Petitioner sought discovery on five issues:

(1) The materials considered by the Commission in connection with its "re-vote" and whether those materials were received pre- or post-remand;

(2) The steps the Commission took (if any) to purge the taint of Commissioner Spagnoli's actions on the agency and the undue influence of the DOJ;

(3) The contacts and pressures placed on the Commission by other people and organizations outside of the agency relating to its "re-vote";

(4) The extent to which any members of Congress contacted the agency about Mr. Bowers's case or placed any pressure on the agency during the recent reauthorization process; and

(5) The Commission's basis for its decision to "re-vote," the basis for its December 8, 2011 decision, and the standards and procedures the agency used.

*Bowers II* at 1183 n.6 (alterations accepted) (quotation marks omitted).

did not violate the Parole Act or any of the Commission's rules or regulations in the process of re-voting his case. *See id.* at 1183.

## G.    Eleventh-Circuit Review in *Bowers II*

Petitioner appealed the district court's judgment to this Court. In *Bowers II*, we first concluded that the district court abused its discretion in denying discovery because it had failed to consider whether good cause existed and had denied discovery based on an unduly narrow reading of the *Bowers I* remand order. *Bowers II* at 1183–84. We also found that the court abused its discretion in denying Petitioner leave to amend his petition. *Id.* at 1185. Given these conclusions, this Court permitted Petitioner to amend his petition and granted him discovery on the limited issue of potential bias and political pressures on the Commission during his post-2005 parole proceedings.[8] *Id.* at 1184–85. We

---

[8]  In so ordering, we stated:

> Bowers alleges that external political pressure prevented the Parole Commission from acting as an unbiased, independent agency when deciding his case. He points to past allegations of political considerations influencing the Parole Commission's decisions, as well as the suspicious timing of the October 4, 2011 decision to re-vote. Given the unique history of bias and alleged political pressure in this case, we find that these allegations are more than "mere speculation" and give us reason to believe that, with further discovery into post-October 2005 political pressure on the Parole Commission from any source Bowers may "be able to demonstrate that he is entitled to relief." Therefore, *Bowers should be granted discovery on the impact that post-October 2005 political pressure may have had on the Parole Commission's 2011 decision*. However, Bowers should not be granted discovery on the influence on the Commission before October 2005 nor on the impact

20

remanded the matter for further action by the Commission in accordance with our instructions.  *Id*. at 1185.

### H.    2014–2016 Habeas Proceedings

Petitioner filed an amended habeas petition on October 29, 2014 (the "Amended Petition"), expanding his allegations of misconduct by the Commission to include the 2011–2012 timeframe and the Commission's Final Denial of his parole eligibility.  In the Amended Petition, Petitioner alleged that the Commission had been improperly influenced by the DOJ in the course of its decision-making and was thereby biased against him when it reconsidered his case.  To support this claim, Petitioner alleged that, because the DOJ supervises the Commission's budget and is solely responsible for advocating before Congress for the Commission's reauthorization, the Commission has strong incentives to make decisions in line with the DOJ's preferences.  Because the DOJ had already indicated its preference for denying Petitioner's parole and construing § 4206(d) narrowly, Petitioner alleged that the Commission was predisposed to follow the DOJ's guidance upon reconsideration.  And the fact that the Final Denial of Petitioner's parole followed shortly after Congress's most recent reauthorization of

---

Commissioner Spagnoli's bias may have had on the Parole Commission as it stands now.

*Id*. at 1184–85 (emphasis added) (footnotes omitted) (citations omitted).

21

the Commission's mandate purportedly supported this bias narrative as well. Petitioner also alleged that the interpretation of § 4206(d) that the Commission adopted in his case was unreasonably narrow and inconsistent with the Parole Act's broader structure.

Petitioner ultimately asked the district court to find that "the probability of actual bias" was "too high to be constitutionally tolerable," *Withrow v. Larkin*, 421 U.S. 35, 47 (1975), and that the Commission's actions violated (1) his Fifth Amendment due process rights, (2) the Parole Act, and (3) the Commission's own rules and regulations. He also asked the court to reverse the Commission's unreasonable interpretation of § 4206(d) as applied in his case.

On June 28, 2016, the district court dismissed the Amended Petition on several grounds. The court properly narrowed the bias inquiry to events that took place after Commissioner Spagnoli's improper intervention, as this Court had already returned Petitioner's case to its posture as of the May 17 Grant. After thorough review of Petitioner's arguments and the evidence gleaned through discovery, the court concluded that the Amended Petition failed to establish that the Commission violated the Parole Act, the regulations promulgated thereunder, or Petitioner's due process rights by acting with bias in his case. It noted that the decision whether to grant parole is highly discretionary and that a reviewing court is not authorized to substitute its own view of a prisoner's eligibility for that of the

22

Commission. To do so, the court concluded, would "alter the balance Congress has drawn by establishing the Parole Commission and [ ] potentially do harm to the manner in which the [Commission] and the various state parole commissions operate." For the same reasons, the court found no abuse of the Commission's discretion in its application of § 4206(d) to the facts of Petitioner's case.

Petitioner now appeals the district court's denial of his Amended Petition for habeas relief.

## II.    STANDARD OF REVIEW

This Court reviews a district court's denial or dismissal of a habeas petition *de novo*. *Santiago-Lugo v. Warden*, 785 F.3d 467, 471 (11th Cir. 2015).

## III.    DISCUSSION

On appeal, Petitioner asks this Court to consider two questions. First: Did the Commission violate the Parole Act by denying Petitioner parole based on an incorrect interpretation of § 4206(d)? And second: Did the Commission fail to act as an impartial decision-maker in Petitioner's case, thereby violating the Due Process Clause, the Parole Act, and this Court's mandate in *Bowers I*? We answer both questions in the negative and affirm the district court's judgment.

### A.    Interpretation and Application of § 4206(d)

#### 1.    Deference due to an agency's decision, generally

The threshold question is how much, if any, deference is owed to the Commission's decision denying mandatory parole. We therefore begin by outlining the principles that guide our review of agency decision-making.

The Parole Commission's substantive decisions to grant or deny parole—including its factual findings and applications of the Parole Act to individual cases—are reviewed only for abuse of discretion. *Glumb v. Honsted*, 891 F.2d 872, 873 (11th Cir. 1990); *see Meagher v. Clark*, 943 F.2d 1277, 1283 (11th Cir. 1991) ("The power of the United States Parole Commission to make [substantive] parole decisions is well-settled and has been protected by the courts."). As we have previously clarified, "[a] federal court will not reverse a decision of the Commission unless it involves flagrant, unwarranted, or unauthorized action that constitutes an abuse of the Commission's discretion." *Glumb*, 891 F.2d at 873.

By contrast, we review an executive agency's determinations of pure legal questions *de novo*, subject to principles of deference articulated by the Supreme Court. *See, e.g.*, *DeKalb Cty. v. U.S. Dep't of Labor*, 812 F.3d 1015, 1020 (11th Cir. 2016) ("Legal conclusions are reviewed *de novo,* keeping in mind that agencies often receive deference in construing the statutes they administer."); *Li v. U.S. Att'y Gen.*, 488 F.3d 1371, 1374 (11th Cir. 2007) ("To the extent that the

24

decision of the Board [of Immigration Appeals] was based on a legal determination, our review is *de novo*."); *Sierra Club v. Adm'r, U.S. E.P.A.*, 496 F.3d 1182, 1186 (11th Cir. 2007) (granting deference to an order of the Environmental Protection Agency interpreting federal and state statutory schemes). Thus, to the extent the Commission's denial of Petitioner's parole was based on a legal interpretation of § 4206(d) with which the non-prevailing party disagrees, we review that interpretation *de novo*, subject to whatever deference to that interpretation is due. *See Bender v. U.S. Parole Comm'n*, 802 F.3d 690, 695–96 (5th Cir. 2015) (granting deference to Parole Commission's regulatory interpretation of two ambiguous provisions of the Parole Act).

That being said, not every interpretation of law by an executive agency is entitled to the same measure of deference. The nature of the underlying statute and the formality of the interpretation at issue dictate the proper analytical approach. Most fundamentally, no deference is due to an agency interpretation of a statute that is not ambiguous in the first instance. *See Castillo v. U.S. Att'y Gen.*, 756 F.3d 1268, 1272 (11th Cir. 2014) ("We review *de novo* the [Board of Immigration Appeals'] interpretation of the Immigration and Nationality Act ('INA'), deferring to the Board's permissible construction only where the statute is ambiguous."); *see also Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1299 (11th Cir. 2011) ("Regulations entitled to *Chevron* deference bind us in regard to the

ambiguous text only.").  Where statutory language is plain and unambiguous, we apply it according to its terms.  *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009).

When statutory language is ambiguous, however, we ask whether the agency's interpretation is of a type that renders it eligible to receive deference under the standard articulated in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  Under *Chevron*, "[w]hen a court reviews an agency's construction of the statute which it administers . . . . [and] the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 842–43.  Thus, when *Chevron* applies, we defer to the agency's interpretation of an ambiguous statute so long as the agency's interpretation is reasonable.  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2124–25 (2016).

Because the *Chevron* standard is generous, its application is limited.  *See Buckner v. Fla. Habilitation Network, Inc.*, 489 F.3d 1151, 1154–55 (11th Cir. 2007) (explaining that "[f]ederal regulations are subject to one of two levels of deference").  Generally speaking, we grant *Chevron* deference only to agency statements that carry the force of law or otherwise bind future agency action, such as rules or regulations promulgated under statutory authority.  *See United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001) (holding that *Chevron* deference applies

"when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority"); *see also Barnhart v. Walton*, 535 U.S. 212, 222 (2002) (concluding that *Chevron* deference applied to an agency regulation in light of "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time").

By contrast, informal interpretive statements that do not carry the force of law—such as those contained in opinion letters, policy statements, agency manuals, and enforcement guidelines—are generally reviewed under the less deferential standard described in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *See Mead*, 533 U.S. at 234 (citing *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000)); *see also, e.g.*, *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1279 n.15 (11th Cir. 2012) (noting that "an agency's interpretation of a statute in an amicus brief is entitled to, at most, *Skidmore* deference"); *Gregory v. First Title of Am., Inc.*, 555 F.3d 1300, 1302 (11th Cir. 2009) (confirming that agency opinion letters do not warrant *Chevron* deference but are entitled to respect under *Skidmore*); *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1268 & n.5 (11th Cir. 2008) (holding that an agency interpretive bulletin was eligible for *Skidmore*

27

deference but not *Chevron* deference).  Deference under *Skidmore* "depend[s] upon the thoroughness evident in [the interpretation's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  *Skidmore*, 323 U.S. at 140; *see also Christensen*, 529 U.S. at 587 (holding that "interpretations contained in formats such as opinion letters are 'entitled to respect' under [the Court's] decision in [*Skidmore*], but only to the extent that those interpretations have the 'power to persuade'").

The district court considered the Commission's Final Denial of Petitioner's parole—as memorialized in its December 2011 Denial Letter—under the abuse-of-discretion standard, concluding that the Commission's determination that Petitioner was ineligible for mandatory parole because he had "seriously" violated prison rules was not so flagrant, unwarranted, or unauthorized as to warrant reversal.  Because the court treated the Commission's decision with respect to Petitioner as a substantive parole decision rather than a determination of pure law, the court found no occasion to consider whether any apparent interpretation of § 4206(d) was entitled to deference under *Chevron* or *Skidmore*.

Petitioner challenges the district court's analysis, insisting that the Commission's parole denial reflected an official agency interpretation of § 4206(d)

28

that must be analyzed under the *Chevron* framework.[9]  To clarify the standard and

measure of deference appropriate here, if any, our first step is to parse the

Commission's ruling as to Petitioner's parole eligibility to determine whether it

involves a disputed interpretation of § 4206(d), as opposed to a mere application of

the statute.

> 2.     Whether the Commission's decision reflects an interpretation of § 4206(d)

The Government has maintained, both in the district court and on appeal,

that the Parole Commission effectively adopted the construction of 18 U.S.C.

§ 4206(d) proposed by its General Counsel, and has sought to defend that statutory

analysis.  However, we are not bound by that position in characterizing the

Commission's actions.  *Cf. Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212

(1988) ("[W]e have declined to give deference to an agency counsel's

interpretation of a statute where the agency itself has articulated no position on the

question, on the ground that 'Congress has delegated to the administrative official

and not to appellate counsel the responsibility for elaborating and enforcing

---

[9] Neither party's briefing addresses whether *Skidmore*'s less deferential standard should be considered here.  In its briefing, the Government asserts that *Glumb*'s abuse-of-discretion standard applies but that, if this Court reaches an interpretive issue, *Chevron* deference is due.  At oral argument, however, the Government took the position that any statutory interpretation within the Commission's decision should be analyzed under *Skidmore*.  Petitioner has maintained throughout this proceeding that *Chevron* is the appropriate lens through which to review the Commission's decision.

29

statutory commands.'"). And, in fact, we do not agree that the Commission adopted its Counsel's interpretation.

In its December 2011 Denial Letter, the Commission denied Petitioner mandatory parole under 18 U.S.C. § 4206(d) because his August 1979 escape attempt "seriously violated prison rules." The Commission found that this escape attempt was "serious" because it:

> had the potential of causing significant unrest and disruption among the population of a secure institution. Other prisoners were in the yard at the time [Petitioner] and another prisoner scaled the inner fence and were trapped between the inner and perimeter fences. [Petitioner's] attempt drew gunfire from tower guards. [Petitioner's] fellow escapee was wounded by the gunfire.

Importantly for this appeal, the Commission further noted that "[t]he passage of time does not diminish the gravity of this rule violation."

It appears to be Petitioner's argument that, in determining whether a prisoner has "seriously violated prison rules," the statute requires the Commission to balance any serious violation against the amount of time that has elapsed since the violation and the absence of any new serious violations. Petitioner contends that the Commission failed to do so. Leaving aside for the moment the fact that the statute contains none of the language attributed to it by Petitioner, we will assume that the statute does articulate the requirement he puts forward. Yet, even with this assumption, the Commission's Denial Letter never promulgated a general rule or otherwise indicated that the passage of time or subsequent good conduct after a

30

serious violation could not diminish the seriousness of "a" rule violation. To the contrary, the Commission made a factual finding that "this" specific rule violation—meaning Petitioner's very dangerous 1979 escape attempt—remained serious, despite the passage of time. Specifically, after explaining why it considered Petitioner's escape attempt to be serious, the Commission saw fit to add the statement, "The passage of time does not diminish the gravity of this rule violation," a statement suggesting that for another instance of putative, serious misconduct, the passage of time might well result in a conclusion that the violation did not constitute a serious violation under the statute.

Likewise, when denying reconsideration, the Commission avoided adopting a general rule precluding the Commission from considering a prisoner's entire record or the passage of time. In that decision, the Commission concluded only that it need not "find more than one serious rule violation before denying parole under § 4206(d)." Notably, Petitioner does not challenge this construction of the statute—that a single violation may suffice to deny mandatory parole. Indeed, he concedes that "[a] recent violation might be sufficiently serious to merit denial" on its own, although he contends that "the same violation committed decades earlier might not."

Given this concession by Petitioner and the statement in the Denial Letter indicating the Commission's operating assumption that the passage of time could

31

play a role in a decision to characterize a particular violation as "serious," we conclude that there is no disputed interpretation of the statute to referee. That being so, we must determine whether the Commission abused its discretion in denying parole to Petitioner. On that point, we agree with the Government that it was not an abuse of discretion for the Parole Commission to conclude that Petitioner's escape attempt was a serious violation rendering him ineligible for mandatory parole. The Commission provided a reasoned analysis, explaining that Petitioner's escape attempt constituted a "serious" violation of prison rules because it endangered the prison population, drew gunfire, and caused injury to Petitioner's fellow escapee. It further found that the escape attempt still qualified as a serious offense many years later, given the gravity of the violation.

We find no abuse of discretion in these findings. Although Petitioner disagrees with the Commission's ultimate conclusion, he does not dispute that his escape attempt created great danger and constituted a very serious violation. In short, Petitioner has not shown that the Commission's factual findings or application of the statute involved a "flagrant, unwarranted, or unauthorized action" constituting an abuse of discretion. *Glumb*, 891 F.2d at 873; *see* S. Rep. 94-648, at 28 (1976) (Conf. Rep.) (noting that "[t]he relevance of material before the Commission is a determination committed to the agency's discretion" and that

"the weight assigned to individual factors (in parole decision making) is solely within the province of the (commission's) broad discretion").

As a final note, we acknowledge that the Chickinell Memos, authored by the Commission's General Counsel, did advance an interpretation that is at odds with the more flexible test that Petitioner proposes. Specifically, these memos expressed the General Counsel's legal conclusion that "the word 'seriously' in § 4206(d) does not allow the Commission to consider the antiquity of a particular rule violation" or to "weigh a 'serious' but dated rule infraction with a subsequent satisfactory disciplinary record." But as one of the Memos recognized, "[t]he Commission has not as yet promulgated a rule adopting this statutory interpretation." In fact, a review of the Commission's decisions here reveals that it likewise declined in the present case to promulgate such a rule or endorse the General Counsel's interpretation.[10] Accordingly, because the Commission did not

---

[10] Although the Commissioners' private views on § 4206(d)'s proper interpretation ordinarily would have no bearing on whether the Commission's written decision reflected a particular statutory interpretation, we find it appropriate to consider the Commissioner's deposition testimony under the circumstances here, given that the only relevant regulation, 28 C.F.R. § 2.53(a), says nothing about the proper construction of § 4206(d) and no transcript exists for the meeting where the Commission denied Petitioner parole. That testimony supports our conclusion that the Commission did not adopt the General Counsel's statutory interpretation, as only one Commissioner who participated in the re-vote fully agreed with that construction. Specifically, Commissioner Mitchell said that he had decided that any serious violation precluded parole, notwithstanding the passage of time. The other Commissioners, however, did not indicate their full agreement with Chickinell's statutory interpretation. Commissioner Cushwa stated that "serious misconduct" would "[n]ot necessarily" preclude mandatory parole "forever and ever" because "[y]ou can't speculate on what's going to happen in two years or five

33

adopt its General Counsel's interpretation, we need not consider whether that interpretation is accurate or merits deference.  Instead, we look to the statements made by the Commission in its Denial Letter and, as explained above, conclude that the Commission's factual findings and application of the Parole Act did not constitute an abuse of discretion.  *Glumb*, 891 F.2d at 873.

## B.    Commission Bias

Petitioner further asserts that the Commission has continually failed to review his case "on a fair and unbiased basis, free of the taint" of internal political pressure—particularly in light of Commissioner Spagnoli's improper intervention and the subsequent involvement of the Attorney General in Petitioner's case. Petitioner claims that this alleged bias violated (1) his due process rights, *see Schweiker v. McClure*, 456 U.S. 188, 195 (1982) (establishing that the Due Process Clause "demands impartiality on the part of those who function in judicial or quasi-judicial capacities"), (2) the Parole Act's mandate that the Commission act as an independent decision-maker, *see Bowers I* at 1279 (noting that the Parole Act was designed to make the Commission independent of the DOJ for decision-making purposes), and (3) this Court's mandate in *Bowers I* that the Commission

years."  And Commissioner Smoot said that she agreed with Chickinell's interpretation, but disagreed that a serious violation automatically precluded mandatory parole, stating that granting parole was within the Commission's discretion.

consider his case on a clean slate, *see Bowers I* at 1295–96 (instructing

Commission to "immediately review Bowers' file to determine *ab initio* whether

any further action is necessary or authorized").

To succeed on his claim that the Commission's impartiality violated his due

process rights, Petitioner must show that "the probability of actual bias . . . is too

high to be constitutionally tolerable." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

In proving bias sufficient to warrant relief, a petitioner may rely upon

circumstantial evidence. *See Rippo v. Baker*, 137 S. Ct. 905, 907 (2017)

(establishing that, when considering a due process claim regarding judicial bias,

courts must ask "whether, considering all the circumstances alleged, the risk of

bias was too high to be constitutionally tolerable").

We begin by clarifying the intended effect of this Court's holding in

*Bowers I* on the course of proceedings on remand.  In *Bowers I*, we held that

Commissioner Spagnoli's interactions with the DOJ in 2005 impermissibly tainted

the Commission's subsequent decision regarding Petitioner's parole.  To remedy

this bias, we remanded to the Commission with instructions to return Petitioner's

case to its posture as of May 2005—prior to Spagnoli's improper intervention—

and to proceed with his case *ab initio*.  Our intent with that instruction was to

cleanse the proceeding of any undue DOJ influence that the Spagnoli Memo may

have invited.

On appeal, Petitioner argues that our remedy was insufficient, asserting that "the resulting DOJ pressure did not vanish merely because the Court remanded the case." At the center of Petitioner's bias argument is the fact that the Commission depends upon the DOJ to lobby on the Commission's behalf before Congress, as well as for its budget and operational support. *See* S. Rep. 94-369, at 14 (1976), *reprinted in* 1976 U.S.C.C.A.N. 335, 336 (stating that the Commission is "independent for policy-making purposes, but is attached to the Department of Justice for administrative convenience"). This dependence, Petitioner posits, incentivizes the Commission to adopt the DOJ's views on the interpretation and application of the Parole Act because clashing with the DOJ on these issues would jeopardize the Commission's very existence.

Because DOJ intervention in Commission matters is uncommon, the incentive Petitioner identifies would at most affect a small number of cases. In this case, however, the DOJ did expressly argue during the 2005 proceedings for its interpretation of § 4206(d). The DOJ advocated this position in its 2005 Position Letter and related communications, and it argued that the Commission should deny Petitioner mandatory parole. Subsequently, the Commission did issue a decision denying parole on October 6, 2005. Given Spagnoli's misconduct and interaction with the DOJ during this 2005 proceeding, we required the Commission to reconsider its decision. After this remand directing *ab initio* review—and as the

Commission was deciding in 2011 whether to reconsider Petitioner's parole eligibility—the DOJ did write to the Commission to "reaffirm our strong opposition to his release," as was its right. The Chickinell Memos also agreed with the DOJ's position by explicitly "concur[ring] with [the] interpretation of the § 4206(d) criteria [offered] by Justice Department attorneys."

Petitioner asserts that, once the Commission became aware of the DOJ's preferences with respect to his case, the pressure to conform to those preferences overcame its duty to conduct an independent analysis of the statute. Specifically, as the Commission was deciding whether to reconsider Petitioner's case, Congress was preparing to vote on a bill re-authorizing the Commission's mandate. Because the DOJ remained the sole entity responsible for lobbying before Congress on the Commission's behalf, Petitioner argues that the incentive to satisfy the DOJ was uniquely urgent. In particular, Petitioner points to the Commission's decision to proceed with a re-vote of his case without honoring the deadline the Commission itself had set for Petitioner's submission of materials in support of his release, a decision that deviated from the Commission's normal procedures and that

37

Petitioner contends can only be explained as an effort to curry favor with the DOJ.[11]

Although Petitioner was unable to uncover any direct evidence that the Commission (1) engaged in discussions with DOJ officials or members of Congress regarding its reauthorization, (2) discussed that issue internally when deciding to expedite the vote, or (3) otherwise entered into the vote with a predetermined outcome in mind, Petitioner points to a few additional facts uncovered during discovery that he claims bolster his narrative. First, it is undisputed that Commissioner Mitchell, who had supported Petitioner's eligibility for parole in 2005, changed his position in 2011. As noted, the DOJ had reaffirmed its interpretation of § 4206(d) during the 2011 proceedings. (During his deposition, however, Mitchell stated that he changed his vote based on his general counsel's advice, as set out in the Chickinell Memos.) Second, the Commission conceded that it did not record its re-vote proceeding in October 2011 and thus has no record of the discussion (or lack thereof) regarding the meaning and application of § 4206(d). Petitioner asks us to infer from all these facts that the

---

[11] Notably, however, the Commission did not actually decide whether to grant Petitioner parole until after Congress had already re-authorized the Commission for a new five-year term.

Commission failed to independently consider his case and instead "blindly adher[ed]" to the DOJ's recommendation.

Taken together, these circumstances demonstrate that, as a structural matter, the Commission can be expected to pay attention to the DOJ's input when interpreting and applying the Parole Act. The question is whether the Commission acted with bias against Petitioner, in particular, when in this case it acted consistently with the DOJ's advocacy. We conclude that it did not. The dynamic Petitioner describes is an inherent and unavoidable feature of the bureaucratic structure Congress erected when it created the Commission as an independent agency housed within the DOJ. While it may be unusual for the Attorney General to advocate for a particular outcome in a parole case, or to opine on an unsettled matter of law under the Parole Act, such intervention is not improper as a general matter.[12]

To be sure, Commissioner Spagnoli's misconduct influenced the DOJ Position Letter that was later sent to the Commission in 2005, and her conduct was

[12] In fact, the Attorney General may appeal a Parole Commission decision under a separate provision of the Parole Act. 18 U.S.C. § 4215(c) ("The National Appeals Board may review any decision of a regional commissioner upon the written request of the Attorney General . . . and, by majority vote, shall reaffirm, modify, or reverse the decision within sixty days . . . ."). Thus, the Parole Act itself contemplates some measure of DOJ involvement. We have found no authority suggesting that the DOJ may not submit its opinions to the Commission as the latter considers pending cases.

clearly improper.  But it is important to note that her outreach was not the sole impetus for the DOJ's interest in Petitioner's case.  Indeed, the Office of the Deputy Attorney General requested information about Petitioner's case from the Parole Commission's Chief of Staff before Spagnoli sent her Memo.  In short, the DOJ's involvement pre-dated the Spagnoli Memo and persisted throughout subsequent proceedings.  Thus, if we remove Spagnoli's misconduct from the picture, we are left with the following scenario:  the impending release of an individual convicted of the brutal and senseless murder of a park ranger understandably captured the attention of the DOJ, which then advocated an interpretation of the operative statute that disfavored Petitioner.  It is not surprising that, in this scenario, the Commission would consider carefully the DOJ's views.  But if we were to conclude that the DOJ's conduct here created an intolerable likelihood of bias in Petitioner's case, we would likewise have to find bias whenever the Commission knows or believes the DOJ to have a particular opinion on a matter and issues a decision that comports with that opinion.  In short, any interplay between the Commission and the DOJ follows from Congress's chosen legislative structure for parole, and it does not, by itself, give rise to a redressable claim.

Because Petitioner has produced no evidence, direct or circumstantial, of specific bias against Petitioner within the Commission that issued the decision now

before us, we cannot conclude that "the probability of actual bias" against him was "too high to be constitutionally tolerable." *See Rippo*, 137 S. Ct. at 907 (quoting *Withrow*, 421 U.S. at 47). Indeed, parole is a matter of grace and there is no constitutional requirement that Congress authorize parole or any mechanism allowing a prisoner to be released any sooner than the expiration of his sentence. The Sentencing Reform Act currently in effect allows for no parole. That Congress instituted parole, but made it subject to a protocol that allowed for substantial input by the DOJ, does not violate the Due Process Clause. In short, we do not find that the Commission here violated the Parole Act or this Court's directive in *Bowers I* that it act impartially in deciding Petitioner's case. We thus affirm the district court's denial of Petitioner's petition for writ of habeas corpus.

## IV.   CONCLUSION

Upon review, we conclude that the Parole Commission did not adopt an erroneous interpretation of § 4206(d). Because the Commission found that Petitioner committed a serious violation of prison rules, the Commission did not err in finding him ineligible for mandatory parole under § 4206(d). Moreover, we do not find that the Commission acted with actual bias against Petitioner or otherwise violated his due process rights or the Parole Act. As such, we affirm the district court's denial of Petitioner's petition for writ of habeas corpus.

**AFFIRMED.**

41

JORDAN, Circuit Judge, concurring.

I join the court's opinion in full, and offer an additional observation.

In my view, 18 U.S.C. § 4207 further supports our conclusion that the Parole Commission believed it could consider (and did in fact consider) Mr. Bowers' entire prison history notwithstanding its finding of a serious institutional violation. The final sentence of § 4207 states without limitation that, in a parole proceeding under "this chapter" (which includes § 4206(d)), "[t]here shall also be taken into consideration such additional relevant information concerning the prisoner (including information submitted by the prisoner) as may be reasonably available." Given that statutory directive, it is difficult to conclude, on this limited record, that the Commission refused to consider Mr. Bowers' post-violation behavior in prison. *See also* 28 C.F.R. § 2.19(b)(1) (repeating the language found in § 4207).